1

2

3

4

5

6

7

8               **IN THE UNITED STATES DISTRICT COURT**

9            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11  MARY SHAFER,                          No. CIV S-09-0383-CMK

12              Plaintiff,

13        vs.                             <u>MEMORANDUM OPINION AND ORDER</u>

14  COMMISSIONER OF SOCIAL
    SECURITY,
15
                Defendant.
16
    _____/
17

18          Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19  review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20  Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

21  judge for all purposes, including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c).  Pending

22  before the court are plaintiff's motion for summary judgment (Doc. 23) and defendant's cross-

23  motion for summary judgment (Doc. 24).

24  / / /

25  / / /

26  / / /

                                          1

# I.  PROCEDURAL HISTORY

Plaintiff applied for social security benefits on September 29, 2005, and on July 13, 2006.  In the applications, plaintiff claims that disability began on November 2, 2004.  Plaintiff claims that disability is caused by a combination of degenerative disc disease, scoliosis, depression, dysthymia, and a learning disability.  Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on September 19, 2007, before Administrative Law Judge ("ALJ") Peter F. Belli.   In an October 26, 2007, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

> 1.   The claimant has the following severe impairments: chronic lower back pain secondary to history of scoliosis repair with Harrington Rod and mild degenerative disc disease;
>
> 2.   The claimant does not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations;
>
> 3.   The claimant has the residual functional capacity to perform the full range of light work; the claimant can lift and carry 20 pounds occasionally and 10 pounds frequently, she can sit and stand for six hours during an eight-hour day; she can occasionally climb ramps and stairs, kneel, crouch, and crawl, but she should avoid climbing ladders, ropes, and scaffolds; and
>
> 4.   The claimant is capable of performing her past relevant work as an office manager and tow truck dispatcher.

After the Appeals Council declined review on December 8, 2008, this appeal followed.

# II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized chronologically below:

January 26, 2004 – The record contains a chart note prepared by Dr. Yokoyama.  The doctor reported the following objective complaints:

> The patient in followup of low back pain.  It seems to be worse over the last two weeks despite no increase in activity or trauma.  She said she has been using her TENS unit with some improvement.  Naprosyn initially

was helpful but is not very effective lately.  She is also taking some
Vicodin at times for her pain.  She has pain primarily in the lower back.
Also gets some radiation down into the front of her thigh to the midportion
of the lower leg.  No neurologic concerns; no GI or GU complaints.

On physical examination, Dr. Yokoyama noted that straight leg raising was negative, motor strength was 5/5 throughout, and plaintiff was intact to light touch.  Dr. Yokoyama changed plaintiff's medication to Clinoril and directed that she "continue to do her warm and cold stretching."

August 20, 2004 – Dr. Yokoyama prepared a chart note.  The doctor stated that plaintiff was being seen for two complaints – worsening mood and low back pain.  While the chart note does not reflect that any mental status examination was performed, the doctor diagnosed depression and prescribed Paxil.  As to low back pain, the doctor referred plaintiff for additional consultation.

April 28, 2005 – John A. Byer, M.D., reported following a neurological examination to address plaintiff's complaints of numbness in her right hand.  As part of his report, the doctor noted the following: ". . . She has a lack of income.  She is currently looking for a job and does have some job prospects.  She is also running a medical billing."

September 20, 2005 – Dr. Yokoyama completed a progress note.  As to plaintiff's low back pain, the doctor reported:

Patient is here for follow-up of chronic back pain.  She continues to have
low back pain on a continuous basis.  Waxes and wanes.  It has been
progressively worsening over the years.  No radiation.  Denies any
neurologic symptoms.  No incontinence.  Ibuprofen has been somewhat
helpful.  TENS unit is variable.  She has been to physical therapy and been
doing exercises.  She is able to sit for about 30 minutes, stand for about 30
minutes, and walk for about an hour before she starts having difficulties.
As a result she has not been able to do much in the way of employment
that would allow her to keep the pain down.

On physical examination, straight-leg raising was negative, motor strength was 5/5 throughout, and sensation was intact to light touch.  Dr. Yokoyama switched medication to Neurontin and recommended that plaintiff continue with warm to cold stretching.

October 13, 2005 – The CAR contains a progress note prepared by Dr. Yokoyama.  The doctor noted that plaintiff had been taking Neurontin, "but stopped secondary to making her feel funny."  Plaintiff told the doctor that "some swimming sensations" in her head had stopped since she ceased Neurontin.  Dr. Yokoyama switched plaintiff to Clinoril and referred plaintiff for a neurologic consultation.

October 31, 2005 – Alan Shatzel, D.O., completed a neurological evaluation.  Dr. Shatzel reported the following background:

> I was asked by Dr. Don Yokoyama to evaluate and provide recommendations for this 42-year-old right-handed woman with a history of scoliosis and major corrective surgery in 1976.  The patient had a Harrington rod placed when she was 12 years old to straighten her spine.  She has done fairly well, however over the last 5 years, has had increasing back pain and discomfort.  It is becoming worse over the last several years.  She was recently tried on sulindac.  This is making her sick to her stomach and causing her significant nausea.  She does not want to try narcotic medicines as she has a strong family history of addiction and is concerned as she has a 6-year-old child at home to care for.  She has tried massage therapy which is transiently helpful.  She has had yoga which is mildly helpful and she has a TENS unit which is helpful.  All of these are transient, however.  She also undergoes chiropractic treatments with deep tissue massage.  This is transiently helpful, again, but does not relieve the symptoms for the long term.

Based on his general physical examination and detailed neurologic examination, the doctor reported as follows:

> . . . The patient has a recent increase in weight and the pain seems to be getting worse over the last several years.  Her examination is mostly intact without symmetrical loss of reflexes and no symmetrical sensory or strength loss.  She continues to have low back pain and discomfort and has not responded to anti-inflammatories medications.

Dr. Shatzel recommended low-dose medication, such as Elavil. The doctor did not offer any functional assessment.

November 14, 2005 – Plaintiff completed a "Pain Questionnaire."  She stated that her pain began in 1976 and is located in her low back.  She stated the pain is constant and radiates down her legs.  According to plaintiff, sitting, standing, walking, lifting, squatting, reaching, and bending over bring on her pain.  Rest does not relieve the pain.  She stated that

1 medication does not help at all but causes side effects such as dry mouth and dizziness.  Plaintiff

2 stated that no surgery had been scheduled or attempted to relieve the pain.  She stated that she

3 uses a TENS unit and sees a chiropractor.  She stated that, despite her pain, she is able to drive,

4 do light house work, and prepare meals.  She added that, due to pain, she cannot "sit at a desk,

5 lifting, driving, or riding for any length of time."  She also stated that she requires assistance with

6 mopping, vacuuming, and yard work.  She stated that she can only walk 200 yards, stand for up

7 to ten minutes, and sit for up to 20 minutes.

8      January 20, 2006 – Agency consultative doctor T.P. Nguyen, M.D., prepared a

9 physical residual functional capacity assessment.  The doctor concluded that plaintiff can

10 occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds.  Plaintiff can sit/stand/walk

11 about six hours in an eight-hour day.  The doctor opined that plaintiff is unlimited in her ability

12 to push/pull.  Plaintiff can frequently balance, occasionally climb ramps and stairs, kneel, stoop,

13 crouch, and crawl, but should never climb ladders, ropes, or scaffolds.  No manipulative, visual,

14 communicative, or environmental limitations were noted.

15      January 21, 2006 – Agency consultative doctor V. Meenakshi completed a

16 psychiatric review technique form.  The doctor concluded there was insufficient evidence to

17 establish the existence of any mental impairment.

18      March 1, 2006 – Plaintiff completed a "Disability Report – Appeal" describing

19 how her conditions have changed over time.  Specifically, plaintiff stated that since January 2006

20 she had been experiencing "more pain, decreased range of motion, increasing loss of function."

21 Plaintiff also stated that she was experiencing a decreased ability to take care of personal

22 hygiene. While she stated that she will continue to see a doctor for her physical impairments, she

23 stated that she had not seen any mental health provider since her last disability report and she

24 added that she had no plans to do so.

25 / / /

26 / / /

1           <u>May 9, 2006</u> – Agency consultative doctor Sharon Amon, M.D., submitted a

2    second physical residual functional capacity assessment.  Dr. Amon's opinion was the same as

3    Dr. Nguyen's except Dr. Amon concluded that plaintiff could in fact occasionally climb ladders,

4    ropes, and scaffolds.

5           <u>July 11, 2006</u> – Plaintiff completed another "Disability Report – Appeal."  She

6    stated that her condition had changed for the worse since March 2006.  In particular, she reported

7    "more difficulty moving, lifting, bending" and added that she cannot twist.  Plaintiff stated that

8    "[i]ncrease in pain meds results in decrease in my ability to function daily."

9           <u>August 18, 2006</u> – Dr. Shatzel submitted a "Letter of Current Medical Status."

10   The doctor stated:

11         Ms. Mary Shafer has been a patient of mine for almost one year.  I
      continue to follow her for intractable low back pain and discomfort.  I

12         have been following Ms. Mary Shafer (AKA Mary Alcala) since October
      of 2005.  At that time I saw her in neurological consultation for low back

13         pain and discomfort.  She has complicated history related to her scoliosis
      repair surgery with Harrington Rods placement as teenager.  Plain imaging

14         of the lumbosacral spine showed normal Rods anatomical alignment, no
      evidence of listhesis with flexion or extension.  There was noted disc

15         disease and end plate sclerosis as well as facet arthritis.  We have been
      trying medical management including interventional pain medical

16         consultation and epidural steroids which were not able to completely
      relieve the pain and discomfort.  The patient was prescribed therapy quite

17         some time ago but has been unable to complete the prescribed course due
      to financial and time constraints.  At last visit on August 18, 2006, it was

18         quite clear that despite our best efforts Ms. Shafer's back pain has
      remained intractable and at that time she was referred for evaluation with

19         our Physical Medicine & Rehabilitation specialist.  The patient has been
      off work and unable to return due to her low back pain and discomfort.

20         Hopefully we will be able to obtain some functional recovery through
      Physical Medicine and Rehabilitation and patient will achieve minimal or

21         no pain and be able to return to work.

22          <u>January 10, 2007</u> – Clare L. Gavin, a learning disability specialist with Dyslexia

23   Consultants of Northern California, prepared a learning disabilities evaluation based on testing

24   performed in November and December 2006.  Ms. Gavin reported the following background:

25         Mary Shafer was referred to assessment of potential learning disabilities
      by Mary Deuel, Vocational Assessment Counselor with the Sacramento

26         County Department of Human Assistance.  Although Ms. Shafer has no

1  history of special education placement, her score of 20 on the Payne
2  Learning Needs Screening Tool (LNST) is highly suggestive of adult
   learning disabilities.  Ms. Deuel has requested an evaluation of Ms.
   Shafer's current levels of cognitive and academic functioning in order to
3  identify learning strengths and challenges, as well as to determine if she is
4  eligible for educational/employment accommodations in accordance with
   the Americans with Disabilities Act of 1998 and Section 504 of the
   Rehabilitation Act of 1973.
5

6  Regarding employment goals, plaintiff reported that she was planning to take medical billing

7  classes in anticipation of a position in a chiropractor's office.  Ms. Gavin noted that plaintiff

8  obtained a full scale IQ score of 88 "with indications of higher potential" on the WAIS-III test.

9  Ms. Gavin classified this score as indicating average intellectual functioning.  Ms. Gavin also

10 noted that "few attentional errors were noted on the achievement activities of this assessment,

11 suggesting Mary has trained herself when performing specific tasks to check and double check

12 for accuracy."  She concluded that plaintiff "presents with good potential for successful

13 employment."  Ms. Gavin recommended the following employment accommodations:  (1) allow

14 plaintiff to clarify instructions; (2) directions/instructions should be provided in short, distinct

15 steps; (3) visual instructions should be provided; (4) plaintiff should be provided a distraction-

16 free work environment; (5) rapid-response job assignments should be minimized; (6) modeling

17 should be used to explain directions and procedures when possible; and (7) plaintiff should

18 receive reassurance and positive reinforcement.

19 _March 22, 2007_ – Plaintiff's therapist, Corrine B. McIntosh, MFT, submitted a

20 "Complete Medical Report (Mental)."  Ms. McIntosh stated that her treatment of plaintiff

21 consisted of 45-50 minutes of psychotherapy sessions on a weekly or bi-weekly basis.  Ms.

22 McIntosh opined that plaintiff's prognosis was "Good, stable at present."  Without referencing

23 any specific objective findings, Ms. McIntosh opined that plaintiff's ability to deal with work

24 stress, maintain attention, understand and carry out complex and/or detailed work instructions

25 were poor.

26 / / /

August 16, 2007 – Treating physician S. Chappidi, M.D., submitted a "Complete Medical Report – Physical." As to clinical findings supporting the report, the doctor noted "Tenderness along paraspinal muscles of low back." Dr. Chappidi stated that plaintiff had not shown any improvement with treatment consisting of medical, a pain clinic, and physical therapy. The doctor opined that plaintiff could occasionally lift/carry up to ten pounds, sit for up to one hour in an eight-hour day, stand for 30 minutes at a time, and walk no more than 20 minutes at a time. The doctor also concluded that plaintiff requires breaks of at least ten minutes every hour. Dr. Chappidi opined that plaintiff could never climb, stoop, crouch, kneel, or crawl, but could frequently balance. For supporting medical findings, the doctor noted only "aggravate back pain." The doctor also concluded that plaintiff can never push/pull. Despite being asked to list medical findings supporting this last assessment, Dr. Chappidi noted none.

August 20, 2007 – Debbie Shafer Rugg submitted a third-party statement as follows:

> Some observations regarding my sister Mary Shafer are as follows; her pain is twenty-four seven. Her ability to do daily activities is extremely difficult. Strong motivation and determination are often not enough leaving tasks or activities possible. I have seen her go to her knees more and unable to get up without assistance more than once. We are unable to do a lot of things we used to, because of these limitations. I use to see her weekly before we moved in 2005, now I see her a few times a year and speak to her almost daily. I admire her perseverance and dedication to all medical paths. It saddens me beyond words to see her level of suffering. . . .

August 26, 2007 – Heather Gardner submitted a third-party statement as follows:

> My mother Mary Shafer used to be able to do many different things. I have noticed thru the years that she has been capable of less and less. I remember my Mom and I going to the mall and shopping like mothers and daughters are supposed to. Now my mom can hardly walk without being in pain. She can not sit, stand, or walk too long otherwise she is in tremendous pain. My mom tries not to show that she is in pain, but to those of us who have seen her at her best, I can honestly say this is her at her worst. The looks she gets tell exactly how she feels without any word of explanation. She has trouble doing the "everyday" tasks that people are supposed to do. As her daughter I worry about her and her well being. She has tried many different things to try and stop the pain, none

have been successful.  My hope is that one day my mom can make it thru one day without experiencing the pain that has taken her over.

August 31, 2007 – Julie Staley submitted a third-party statement as follows:

Mary Shafer and I spent time together on a regular basis.  She is in constant pain regardless of the task at hand, sitting, standing, walking, riding in a car.  We have traveled to Oregon when my father was terminally ill.  We made several stops along the way to she could get out and stretch to try and alleviate the pain.  I have seen her try anything that has been proposed to her in the form of therapy to help in pain management.  Massage, acupuncture, water aerobics, heat, ice, sauna, jacuzzi.  I have seen the pain progress day after day where it wore on her emotionally to the point of depression where she mentioned she would rather be dead than continue in pain all the time.  Mary has a daughter that she cares for full time and goes to school herself plus try to do her other daily activities in pain.  She gets very short with people, and at times all Mary can do is sleep so she doesn't have to feel the constant pain.  Very seldom do I see her smile or laugh, she looks pale and very distraught most of the time.

September 5, 2007 – Craig E. Smith submitted a third-party statement as follows:

In the time that I've known Mary Shafer her chronic back pain has increased dramatically to the point that simple household chores are almost impossible to do.  Even a simple car ride to the store for groceries is difficult.  Any kind prolonged sitting or standing causes her great pain.  She had been taking medications recommended by her doctor but they only have a short time effect if any at all sometimes. . . .

### III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

## IV.  DISCUSSION

In her motion for summary judgment, plaintiff argues: (1) the ALJ rejected the opinion of treating physician Dr. Chappidi without providing legally sufficient reasons; (2) the ALJ failed to properly evaluate the severity of plaintiff's mental impairment; (3) the ALJ failed to properly credit plaintiff's statements; (4) the ALJ failed to properly address third-party evidence; and (5) hypothetical questions posed by the ALJ to the vocational expert did not accurately reflect plaintiff's residual functional capacity.

### A.    Evaluation of Medical Opinions

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4

10

1    (9th Cir. 1990).

2          In addition to considering its source, to evaluate whether the Commissioner

3    properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are

4    in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

5    uncontradicted opinion of a treating or examining medical professional only for "clear and

6    convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

7    While a treating professional's opinion generally is accorded superior weight, if it is contradicted

8    by an examining professional's opinion which is supported by different independent clinical

9    findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

10   1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

11   rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

12   81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

13   the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

14   finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

15   legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

16   professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

17   without other evidence, is insufficient to reject the opinion of a treating or examining

18   professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

19   conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

20   1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

21   see also Magallanes, 881 F.2d at 751.

22          As to Dr. Chappidi, the ALJ stated:

23          The record also contains an assessment conducted by the claimant's
            current treating physician who reported in August 2007 that the claimant
24          was limited to less than sedentary work activities due to chronic back pain.
            However, the only clinical finding to support his assessment was positive
25          tenderness along the paraspinal muscles of the lower back.  (Exhibit 12F).
            The undersigned notes that physical examinations performed by Dr.
26          Chappidi in 2002 also document findings of positive tenderness over the

paraspinal muscles of the lumbar spine but the claimant was able to work at that time. (Exhibit 13F, p. 10). Further, treatment records supplied by Dr. Chappidi do not support the severity of limitations. In February 2007, Dr. Chappidi restarted the claimant on Prozac but there is no indication Dr. Chappidi performed a thorough examination . . . . (Exhibit 15F, p. 11). . . . Given the lack of supported objective medical findings, coupled with the lack of thorough physical examinations performed by Dr. Chappidi in 2007, the undersigned could not credit the conclusions by Dr. Chappidi.

Plaintiff argues that the ALJ erred in rejecting Dr. Chappidi's opinion, as expressed in the August 2007 report, in favor of the opinion of a non-examining agency source. The court does not agree. As the ALJ observed, Dr. Chappidi did not report objective clinical findings which would be consistent with the limitations the doctor opined. Some examples will suffice to demonstrate the paucity of clinical findings attending Dr. Chappidi's report. As to lift/carry restrictions, Dr. Chappidi reported the following "medical findings": "chronic low back pain." For sit/stand limitations, the doctor reported "as above" as "medical findings" supporting the assessment. As to postural activities, the doctor listed "aggravate back pain" as a supporting "medical findings." No clinical evidence is listed to support the doctor's conclusion as to how often plaintiff can perform various physical functions. Contrary to plaintiff's argument, the ALJ does not "turn the hierarchy of physician evidence on its head" by rejecting the conclusory opinion of a treating source which is supported, at best, by minimal findings.

## B.     Severity of Plaintiff's Mental Impairment

In order to be entitled to benefits, the plaintiff must have an impairment severe enough to significantly limit the physical or mental ability to do basic work activities. See 20 C.F.R. §§ 404.1520(c), 416.920(c). In determining whether a claimant's alleged impairment is sufficiently severe to limit the ability to work, the Commissioner must consider the combined effect of all impairments on the ability to function, without regard to whether each impairment alone would be sufficiently severe. See Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir. 1996); see also 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923. An impairment, or combination of impairments, can only be found to be non-severe if the evidence establishes a

1   slight abnormality that has no more than a minimal effect on an individual's ability to work.  See

2   Social Security Ruling ("SSR") 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.

3   1988) (adopting SSR 85-28).  The plaintiff has the burden of establishing the severity of the

4   impairment by providing medical evidence consisting of signs, symptoms, and laboratory

5   findings.  See 20 C.F.R. §§ 404.1508, 416.908. The plaintiff's own statement of symptoms alone

6   is insufficient.  See id.

7            Regarding plaintiff's alleged mental impairment, including alleged learning

8   deficits, the ALJ summarized the following evidence:

9            The record also indicates the claimant has a past history of treatment for
             depression, situational anxiety, and post-traumatic stress disorder in 1997.
10           She was maintained on Prozac from May to December 2001.  (Exhibit
             13F, pgs.18-19, 22).  The claimant reported some worsening depression in
11           August 2004, not relieved by Prozac.  She was diagnosed with depression
             and started on Paxil.  (Exhibit 2F, p. 13).  The claimant was assessed with
12           situational stress reaction secondary to a pending divorce and death of her
             father in April 2005.  (Exhibit 2F, 0. 11).  On examination in October
13           2005, the claimant was alert and fully oriented.  Her speech and language
             were normal; her fund of knowledge was good and her memory was intact.
14           (Exhibit 2F, p. 2).

15           Records from Sacramento City College dated January 2007 showed some
             evidence of a learning disability and possible attention deficit disorder
16           during a learning disabilities evaluation.  The claimant was also referred to
             her primary medical provider to rule out panic disorder, sleep disorder,
17           post-traumatic stress disorder, and attention deficit hyperactivity disorder.
             After testing was completed it was determined that the claimant would
18           need accommodations in the college environment but it was concluded the
             claimant could perform office work given her history of success in that
19           area.  (Exhibit 10F).  In February 2007, the claimant requested that she
             restart antidepressant medications for sleep disturbance, lack of energy,
20           and feelings of sadness.  The claimant was assessed with depression and
             restarted on Prozac.  (Exhibit 15F, p. 11).

21

22  In concluding that plaintiff does not have any severe learning impairment, the ALJ stated:

23           . . . While educational testing revealed evidence of a learning disability,
             the claimant has a successful history of performing semi-skilled office
24           work with no difficulty and the evaluators determined the claimant had
             good potential for successful employment. . . .  The record also indicates
25           the claimant is . . . attending college level courses on a regular basis,
             earning passing grades.  While testing demonstrated some difficulties
26           paying attention, it was determined the claimant could perform office work

                                        13

1       as the claimant is able to concentrate and maintain attention sufficient to
2       complete college level courses.  (Exhibit 10F).

3   The ALJ addressed plaintiff's depression as follows:

4           . . . Further, while several other possible mental health impairments were
            noted by testing officials, the claimant has not been formally diagnosed
5           with any mental impairment other than depression during the period under
            adjudication and treatment for her depression has been sporadic.  Mental
6           status examination in October 2005 showed the claimant was functioning
            well; her memory was intact and her fund of knowledge was good.
7           (Exhibit 2F, p. 2).  The claimant attended psychotherapy sessions in
            January 2006 but she admitted during educational testing that she had not
8           required antidepressants since her divorce in 2005.  (Exhibit 11F).  In fact,
            her treating physician reported in January 2006 the claimant cooperated
9           with appointments; she follows simple instructions; she did not require
            assistance to attend appointments; she got along with others; and there was
10          no evidence of recent depression.  (Exhibit 4F).  The record indicates the
            claimant was restarted on Prozac in 2007.  However, there is no evidence
11          of more than mild limitations of functioning due to depression.  The record
            indicates the claimant independently cares for her daughter; she performs
12          light housework, prepares meals, and handles all errands necessary to run a
            household.  (Exhibit 2E). . . .
13

14  Plaintiff argues that the ALJ analysis failed to account for the opinions provided by Ms.

15  McIntosh, plaintiff's therapist.  Plaintiff also argues that the ALJ had a duty to develop the record

16  regarding plaintiff's mental impairment.

17          1.      Ms McIntosh's Opinions

18          Citing 20 C.F.R. § 404.1513(d)(1), plaintiff argues that the ALJ improperly

19  rejected evidence from plaintiff's therapist – Ms. McIntosh – and, had he "seriously considered

20  this credible, professional third party evidence," the ALJ could not have concluded that plaintiff

21  does not have a severe mental/learning impairment.  Under 20 C.F.R. § 404.1513(d)(1), evidence

22  from non-physician medical sources, such as nurse practitioners and therapists, is relevant to

23  "show the severity of your impairment(s) and how it affects your ability to work."  As to Ms.

24  McIntosh, the ALJ stated:

25          In reaching the foregoing determination [that plaintiff does not have a
            severe mental or learning impairment], the undersigned considered the
26          functional assessment submitted by therapist, Corrine McIntosh in March

14

1
2007.  Ms. McIntosh indicated the claimant had been diagnosed with
dysthymic disorder and attention deficit hyperactivity disorder but her

2
condition was stable.  Ms. McIntosh concluded the claimant had serious
limitations in her ability to deal with work stress; maintain concentration

3
and attention; and understand, remember, and carry out complex
instructions.  Limitations were also reported in relating to others,

4
functioning independently, and behaving in an emotionally stable manner.
(Exhibit 11F).  While the undersigned has considered this assessment, the

5
opinion was given no weight since the assessment was completed by a
therapist rather than a medical doctor and no progress notes were

6
submitted to substantiate the functional report.  Moreover, there is no
indication the claimant has actually been diagnosed with a dysthymic

7
disorder or attention deficit disorder by a physician.  In addition to the lack
of corroborating treatment records, the assessment is totally contrary to the

8
remainder of the record documenting the claimant's high level of
functioning.  While Ms. McIntosh concludes the claimant cannot maintain

9
attention or concentration, she is attending college level courses and she
has been successful in completing her course work.  Ms. McIntosh also

10
indicated the claimant cannot function independently but she cares for her
daughter and maintains a household independently.  Additionally, there is

11
no evidence of any deficits in social functioning mentioned by her treating
providers and the claimant has not required hospitalization despite claims

12
of mood instability and inability to function.  Thus, since the assessment
submitted by Ms. McIntosh is contrary to the remainder of the record and

13
not supported by any progress notes, the undersigned gave no weight to the
conclusions reached by Ms. McIntosh.

14

15
The court finds no error.  Essentially, though the ALJ cited the fact that Ms. McIntosh is not a

16
medical doctor, the ALJ nonetheless considered her opinions as if they were from a doctor.  In

17
giving no weight to Ms. McIntosh's opinions, the ALJ properly noted that Ms. McIntosh

18
provided little by way of objective clinical findings.

19
Moreover, the ALJ correctly noted that Ms. McIntosh's conclusions were not

20
consistent with any of the other medical evidence, or lack thereof, relating to plaintiff's alleged

21
mental impairment and/or learning disability or plaintiff's activities of daily living.  For example,

22
while Dr. Yokoyama prescribed Paxil in August 2004 for a reported mental disorder, the doctor

23
does not report any objective clinical findings indicating the presence of any such disorder.  In

24
January 2006, Dr. Meenakshi reported that there was insufficient evidence to  establish the

25
existence of any mental impairment.  In March 2006, plaintiff completed a "Disability Report –

26
Appeal" describing how her conditions have changed over time.  While plaintiff stated that she

1   will continue to see a doctor for her physical impairments, she stated that she had not seen any

2   mental health provider since her last disability report and she added that she had no plans to do

3   so.  In January 2007 learning disability specialist Clare Gavin noted that, despite plaintiff's

4   complaints of disabling mental impairments, plaintiff was anticipating taking a job in a

5   chiropractor's office.  Ms. Gavin concluded that plaintiff "presents with good potential for

6   successful employment."  Finally, the record indicates that plaintiff was able to attend college.

7   Contrary to Ms. McIntosh's opinions, none of this evidence suggests the existence of a disabling

8   mental and/or learning impairment.

9                    2.      Duty to Develop the Record

10           Plaintiff also contends that the ALJ failed to develop the record regarding her

11   mental impairment.  The ALJ has an independent duty to fully and fairly develop the record and

12   assure that the claimant's interests are considered.  See Tonapetyan v. Halter, 242 F.3d 1144,

13   1150 (9th Cir. 2001).  When the claimant is not represented by counsel, this duty requires the

14   ALJ to be especially diligent in seeking all relevant facts.  See id.  This requires the ALJ to

15   "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts."

16   Cox v. Califano, 587 F.2d 988, 991 (9th Cir. 1978).   Ambiguous evidence or the ALJ's own

17   finding that the record is inadequate triggers this duty.  See  Tonapetyan, 242 F.3d at 1150.  The

18   ALJ may discharge the duty to develop the record by subpoenaing the claimant's physicians,

19   submitting questions to the claimant's physicians, continuing the hearing, or keeping the record

20   open after the hearing to allow for supplementation of the record.  See id. (citing Tidwell v.

21   Apfel, 161 F.3d 599, 602 (9th Cir. 1998)).

22           Here, contrary to plaintiff's assertion, the evidence relating to mental and/or

23   learning impairments was neither ambiguous nor inadequate.  As discussed above, the evidence

24   before the ALJ clearly revealed no mental and/or learning impairment.  There was no ambiguity

25   in the evidence.  The ALJ had no duty to develop the record with respect to a claimed

26   impairment the evidence clearly showed did not exist to any significant degree.

C.    **Plaintiff's Credibility**

The Commissioner determines whether a disability applicant is credible, and the court defers to the Commissioner's discretion if the Commissioner used the proper process and provided proper reasons. See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996). An explicit credibility finding must be supported by specific, cogent reasons. See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990). General findings are insufficient. See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995). Rather, the Commissioner must identify what testimony is not credible and what evidence undermines the testimony. See id. Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not credible must be "clear and convincing." See id.; see also Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007), and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

If there is objective medical evidence of an underlying impairment, the Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence. See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc). As the Ninth Circuit explained in Smolen v. Chater:

> The claimant need not produce objective medical evidence of the [symptom] itself, or the severity thereof. Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom. By requiring that the medical impairment "could reasonably be expected to produce" pain or another symptom, the Cotton test requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon.

> 80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions. See Bunnell, 947 F.2d at 345-47. In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the claimant cooperated during physical examinations or provided conflicting statements concerning drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the claimant testifies as to symptoms greater than would normally be produced by a given impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

As to plaintiff's credibility, the ALJ stated:

> At the hearing, the claimant testified she was taking English and math courses at Sacramento City College.  The claimant stated she is unable to work due to chronic lower back pain.  The claimant related she receives treatment through a pain clinic and she sees a psychologist two times a month.  During the day, the claimant testified she cooks, does the laundry, assists her daughter, shops, drives daily, and attends school for four hours a day.  The claimant indicated she does not require a cane or brace.  The claimant stated she receives weekly acupuncture and she has been taught breathing exercises to control her pain.  The claimant testified her medications make her tired all the time.  She also described weakness in the legs three to five times a week and she stated due to depression she has problems concentrating.

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible.  In support of this determination, the undersigned notes that the claimant's level of daily activities is not consistent with severe levels of pain and is compatible with at least light exertional work.  The claimant is attending college level courses four hours a day, she performs light household chores, she cares for her daughter, and she can perform all necessary errands.  While the claimant testified she has difficulties performing any activities for long periods of time, she is capable of sitting at school and performing the necessary standing and walking to get to her classes and to perform household chores and errands.  Although the claimant testified to side effects from her medications, there is no evidence of fatigue that would preclude the claimant from working.  She is able to concentrate to attend classes and she testified she drives daily and the undersigned notes that no side effects had been reported to her treating providers.  In addition, the record fails to

document the claimant has ever presented to her medical appointments in severe pain and there is no record of any emergent treatment due to severe back pain.  Moreover, while the claimant has described a history of back pain since she was a child, there is no evidence of any atrophy or muscle wasting throughout the treatment records.  Two common side effects of prolonged and chronic pain are weight loss and diffuse atrophy.  Thus, it can be inferred that, although the claimant experiences some degree of pain, that pain has not altered her use of her muscles and joints to the extent that it has resulted in diffuse atrophy or muscle wasting.  Based on the foregoing, there is a lack of medical documentation of an impairment which would cause extreme pain or pain which would compromise the claimant's ability to perform work-related activities.

This analysis reveals that the ALJ relied on the following in discounting plaintiff's testimony: (1) inconsistencies between plaintiff's daily activities and her statements of disabling pain; (2) failure to report side effects of medications to doctors; (3) lack of emergent treatment related to severe or acute pain; and (4) lack of weight loss or atrophy.  Under <u>Smolen</u> discussed above, any one of these reasons would justify an adverse credibility finding.

The issue is whether there is substantial evidence in the record to support any one of the reasons cited by the ALJ.  The court finds that there is.  As to daily activities, the court finds that plaintiff's various statements have been inconsistent.   For example, in November 2005 plaintiff stated on a pain questionnaire that, despite her pain, she is able to drive, do light house work, and prepare meals.  However, this is contradicted by her statement made on the same questionnaire that, due to pain, she cannot "sit at a desk, lifting, driving, or riding for any length of time."  Plaintiff stated on the questionnaire that she can only walk 200 yards, stand for up to ten minutes, and sit for up to 20 minutes.  However, in September 2005 plaintiff reported to Dr. Yokoyama that she is able to sit for about 30 minutes, stand for about 30 minutes, and walk for about an hour before she starts having difficulties.  Further, plaintiff reported to Dr. Byer in April 2005 that she was running a "medical billing" was  currently looking for a job and had some employment prospects.  Similarly, she reported to Ms. Gavin in January 2007 that she was planning to take medical billing classes in anticipation of a position in a chiropractor's office.  Thus, contrary to plaintiff's statements of disabling pain, it appears that during this time

1   plaintiff's symptoms were not so disabling as to preclude her from seeking employment.

2       **D.**    **Lay Witness Evidence**

3           Plaintiff argues that the ALJ erred with respect to third-party evidence from lay

4   witnesses.[1]  In determining whether a claimant is disabled, an ALJ generally must consider lay

5   witness testimony concerning a claimant's ability to work.  See Dodrill v. Shalala, 12 F.3d 915,

6   919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay

7   testimony as to a claimant's symptoms or how an impairment affects ability to work is competent

8   evidence . . . and therefore cannot be disregarded without comment."  See Nguyen v. Chater, 100

9   F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony

10   of lay witnesses, he must give reasons that are germane to each witness."  Dodrill, 12 F.3d at

11   919.

12           As to third-party statements in this case, the ALJ stated:

13       The record also contains several third party statements from friends and
    family members who report the claimant suffers from chronic pain.

14       (Exhibits 14E).  However, while the undersigned considered these
    statements they were afforded no weight since as reported above, the

15       claimant's daily activities and lack of objective physical findings fail to
    document the claimant's pain is severe enough to be considered disabling.

16       The claimant's reports ability to attend college level courses and her high
    level of daily activities is contrary to the reports of disabling and severe

17       levels of pain.

18   According to plaintiff, "[t]he ALJ's blanket rejection of the third party evidence hardly

19   constituted specific reasons 'germane' to each witness."  Plaintiff also argues that, to the extent

20   the ALJ rejected third-party evidence for the same reasons he rejected plaintiff's credibility, such

21   reasons were insufficient.

22   / / /

23   / / /

24

25        [1]    Plaintiff also argues that the ALJ failed to properly consider third-party evidence
from other medical sources, specifically her treating therapist, Ms. McIntosh.  The ALJ's
26   consideration of Ms. McIntosh is discussed above in section IV.B.

1    The court finds no error.  Plaintiff's argument flows from the notion that, in order

2    to state reasons germane to each witness, the ALJ must state reasons unique to each witness or

3    repeat an analysis set forth elsewhere in the decision that is also relevant to the lay witness.  As

4    discussed above, evidence of plaintiff's daily activities and inconsistencies within her own

5    statements provided a legally sufficient basis upon which to reject plaintiff's testimony.  The

6    same evidence provides sufficient reasons to reject lay witness testimony in this case.  Because

7    the rationale applicable to plaintiff's testimony is also applicable to the lay witnesses' statements,

8    the rationale is germane to each witness.

9    **E.    Hypothetical Questions**

10   Hypothetical questions posed to a vocational expert must set out all the

11   substantial, supported limitations and restrictions of the particular claimant.  See Magallanes v.

12   Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's

13   limitations, the expert's testimony as to jobs in the national economy the claimant can perform

14   has no evidentiary value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While

15   the ALJ may pose to the expert a range of hypothetical questions based on alternate

16   interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's

17   determination must be supported by substantial evidence in the record as a whole.  See Embrey v.

18   Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

19   A review of the hearing transcript reflects the following exchange between the

20   ALJ and the vocational expert:

21          Q:    Mr. Dettmer, have you had an opportunity to review the
     vocational history in this matter?
22

23          A:    I have, Judge.

          Q:    Would you summarize it for us, please, and include therein
24   your opinion of the skill and exertional level?

25          A:    Yes.  Well, she' done cooking at a daycare center.  That
     would be – but she testified it was part time fill-in work.  If you – all
26   cooking jobs in the DOT are medium.  And fast food cook is 313.347-010,

which is medium, SVP 5.  I would think that that one could be light and if could be – it's I'm sure it's of a lower SVP than that, Judge but that is what the DOT says.  She was a tow truck – tow truck dispatcher.  That's 249.167-014.  And that's sedentary, SVP 5.  An office manager is 169.167-034, that's sedentary, SVP 7.  It could have been at a slightly lesser SVP.  Secretary is SVP 6.  So it's somewhere in that range, in the skilled range, Judge.

Q:      And the owner of an auto repair business?

A:      Well, she functioned as an office manager.  I took it as that.

Q:      Okay.

A:      That wouldn't be significantly different SVP.

Plaintiff's attorney then engaged in the following exchange with the vocational expert:

Q:      If you had an individual or a hypothetical individual with the Claimant's age and educational background as testified to with the following – and the past history as testified to, with the following limitations, the individual would have a poor ability to deal with work stress and maintain attention and concentration.  They would have the following physical limitations.  They would only occasionally be able to lift and carry up to 10 pounds.  They would be able to sit a total of one hour in an eight-hour day and stand and walk 30 minutes.  I'm sorry.  Stand 30 minutes, walk 20 minutes with at least a 10-minute break every hour.  And as far as the posturals, they would be never to climb, stoop, crouch, kneel, or crawl.  Would the individual be able to do any of the past relevant work?

A:      No.  The limitations – you said it was sit one hour per – in an eight-hour day?

Q:      Yes.

A:      And then stand and walk that was 30 minutes and 20 minutes.  Now was that a time or in a day?  Either way I think you're outside of the normal – when you throw in the poor attention and concentration, I would say, no, that person would not be employable.

Q:      So no past relevant work and no national economy?

A:      Correct with those limitations.

Based on the vocational expert's testimony, the ALJ concluded as follows:

The claimant reported that she worked as an office manager from 1992 until 1996.  At that position, the claimant worked on a full time basis and she was not required to lift or carry more than ten pounds.  The claimant's

earnings record indicates that this employment was performed as substantial gainful levels. (citation omitted). Also, the claimant performed this job activity for several years, which is sufficient time to learn the duties required of the position. According [to] the claimant's reports, this job did not require heavy physical exertion or climbing, stooping, kneeling, crouching, or crawling. The evidence indicates the claimant is capable of light work with occasional postural activities. Therefore, since the claimant's past relevant work, as she actually performed it, did not involve more than sedentary work activities, there is no impairment shown in this case which would preclude the claimant from performing her former work as an office manager.

Plaintiff argues the ALJ erred by not relying on the vocational expert's answer to her attorney's question which, according to plaintiff, most accurately reflected her exertional and non-exertional limitations. The court does not agree. At the hearing, plaintiff's counsel posed a hypothetic question which described an individual with a poor ability to deal with work stress and maintain concentration and attention, an inability to sit for more than one hour in an eight-hour day, an inability to stand for more than 30 minutes or walk for more than 20 minutes, the requirement of 10-minutes breaks every hour, and a complete in ability to climb, stoop, crouch, kneel, or crawl. In response to this question the vocational expert testified that the hypothetical individual would be disabled. Plaintiff's counsel's hypothetical, however, does not accurately describe plaintiff's residual functional capacity. For example, contrary to counsel's hypothetical individual who cannot sit for more than an hour, the credited medical evidence in this case establishes that plaintiff could sit/stand for six hours in an eight-hour day.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

## V.  CONCLUSION

2          Based on the foregoing, the court concludes that the Commissioner's final

3   decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY

4   ORDERED that:

5                1.       Plaintiff's motion for summary judgment (Doc. 23) is denied;

6                2.       Defendant's cross-motion for summary judgment (Doc. 24) is granted; and

7                3.       The Clerk of the Court is directed to enter judgment and close this file.

8

9    DATED:  September 29, 2010

10                                          _____

11                                          **CRAIG M. KELLISON**
                                           UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26